# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **SHEILA and BRITTNEY DRINNON,** )<br>as next of kin and Personal Representatives of )<br>**THE ESTATE OF JEFFREY DRINNON,** )<br>)<br>    **Plaintiffs,** )<br>)<br>v. )<br>)<br>**CLAIBORNE COUNTY,** )<br>**SHERIFF ROBERT BROOKS,** )<br>**SGT. DEWAYNE NAPIER,** )<br>**DEPUTY ADAM SOUTHERN,** )<br>**DEPUTY CARL MOZINGO,** )<br>**DEPUTY BRIAN ISBELL,** )<br>**DEPUTY JACOB CRAWFORD,** )<br>**UNKNOWN MEDICAL PROFESSIONAL(S),** )<br>**UNKNOWN JAIL OFFICER(S), and,** )<br>**SOUTHERN HEALTH PARTNERS, Inc.** )<br>)<br>    **Defendants.** ) | **JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES

**COMES NOW**, Plaintiffs Sheila and Brittney Drinnon, by and through undersigned counsel and file this Complaint alleging claims pursuant to 42 U.S.C. § 1983 and §1988; negligence and assault against Defendants as follows:

## PARTIES

1. At all times material hereto, Plaintiff's Decedent Jeffrey Drinnon was a pre-trial detainee housed at the Claiborne County Jail.

2. At all times material hereto, Claiborne County owned the Claiborne County Jail located at 415 Straight Creek Rd #2, New Tazewell, TN 37825, Claiborne County, Tennessee. Claiborne County is a political governmental entity in the State of Tennessee.

-1-

3. At all times material hereto, Robert Brooks was the duly elected Sheriff of Claiborne County acting under color of law who was statutorily responsible for the operation of the Claiborne County Jail; for the hiring, firing, training and supervision of deputies to man the Jail; and for the safety of persons housed therein against their will. He owed a duty to Jeffrey Drinnon under the Fourteenth Amendment to take the necessary actions to ensure Drinnon's rights were upheld while he was in the Claiborne County Jail.

4. The County is legally liable for the non-negligent acts or failures to act of its deputies under T.C.A. § 8-8-302, including instances of *gross* negligence. Claiborne County is legally liable for the negligence of persons employed by the County, including Sherriff Brooks and any other employee at the Jail under T.C.A. § 29-20-205. Claiborn County has waived its immunity pursuant to T.C.A. § 8-8-302 and § 29-20-205. Furthermore, Sherriff Brooks is civilly responsible to Jeffrey Drinnon for the acts and failures to act of his Jailers/officers. In addition, Sheriff Brooks is civilly liable for the actions of his Jailers/officers performing the tasks and duties that Brooks was statutorily responsible for performing. *See* T.C.A. § 41-4-101.

5. Claiborne County has a statutory and constitutional duty to maintain the Jail to secure the safe custody, health, and comfort of inmates housed therein. *See* T.C.A. §§ 5-7-104, 106. Claiborne County is also required to provide to the Jail sufficient medical personnel as needed to provide timely and appropriate medical services to the persons confined who require such services at the sole expense of the County. T.C.A. § 41-4-115. The County also had a constitutional duty to provide timely and adequate medical care and treatment to inmates suffering from known serious medical conditions.

6. To discharge its statutory and constitutional obligations regarding medical care, the County contracted with a third-party medical provider, Southern Health Partners, Inc. ("SHP") for

medical services for inmates at the Claiborne County Jail. These services are provided by nursing staff and a largely absentee supervising physician. Southern Health Partners is a Tennessee corporation, formed in Delaware and doing business in Hamblen County, with a principal office in 2030 Hamilton Place Blvd, Suite 140, Chattanooga, TN 37421. SHP was performing traditional governmental services required to be performed by Claiborne County, making it liable under 42 U.S.C. § 1983 for violations of Mr. Drinnon's constitutional rights under color of law.

7. Defendants Sgt. DeWayne Napier and deputies Adam Southern, Carl Mozingo, Brian Isbell and Medic/SWAT Jacob Crawford are the officers involved in the detention and arrest of Jeffrey Drinnon on or around February 14, 2019.

8. The Defendant Jail Officers, whose identities are unknown to the Plaintiffs but obtainable through discovery and are known to Sherriff Brooks and the County, consist of the Jail Officers responsible for his wellbeing while he was in custody at the County Jail.

9. The Defendant Medical Professionals, whose identities are unknown to the Plaintiffs but obtainable through discovery and are known to Sherriff Brooks, the County, and SHP, consist of those professionals providing medical services at the Jail and whom were responsible for Jeffrey Drinnon's physical wellbeing and health.

## VENUE AND JURISDICTION

10. This is an action for relief for violations of the Fourth and Fourteenth Amendment to the United States Constitution, *see* 42 U.S.C. § 1983 and pendent claims under state law.

11. This Court has original federal question jurisdiction over the Plaintiffs' claims under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331 and § 1343 and jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12. At all times material hereto, the constitutional violations that resulted in the injuries to Plaintiffs occurred in Claiborne County, Tennessee, making venue in the Eastern District of Tennessee proper under 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

13. **Background**. Growing abuse of methamphetamines in the United States has led to arrest-related deaths in situations where law enforcement officers used TASERS / Electronic Control Weapons (ECWs) on drug-intoxicated suspects. Based in part on the growing scientific evidence suggesting TASER use increases the risk of sudden death in such at-risk populations, law enforcement agencies and public policy groups have taken the position that it is only appropriate to use a TASER device on a person known to be under the influence of drugs when that person poses a danger and should never be used on a person whom is only passively resisting arrest.[1]

14. According to Guidelines released by the Police Executive Forum in 2011:

> All subjects who have been exposed to [electronic control weapon] application should receive a medical evaluation by emergency medical responders in the field or at a medical facility. Subjects who have been exposed to prolonged application (i.e., more than 15 seconds) should be transported to an emergency department for evaluation.
>
> All subjects who have received an ECW application should be monitored regularly while in police custody even if they received medical care.

---

[1] https://www.policeforum.org/assets/docs/Free_Online_Documents/Use_of_Force/electronic%20control%20weapon%20guidelines%202011.pdf

15. Further, it is to be noted that TASER® in its operations manual states that the use of an ECW should be kept to a minimum of and in certain documents recommends no person be subjected to more than a total of 15 seconds of application.

16. Further, all arrestees known or suspected to be under the influence of methamphetamine should be evaluated by a qualified medical professional for acute toxicity (overdose). Medications may be given to address specific complications related to the overdose, such as reduced kidney function or heart issues. Of relevance here, chronic and/or acute methamphetamine toxicity can cause abnormal heart rhythms, precipitously high blood pressure, and/or inflammation of the blood vessels, resulting in a hemorrhagic or ischemic stroke. If a meth overdose and/or issues stemming from chronic use are met with quick and capable medical attention, the person has the best chances of recovery.

17. **Jeffrey Drinnon's Arrest.** On or about February 15, 2019, Jeffrey Drinnon was detained and arrested by Claiborne County Sherriff's deputies, namely, Defendants Sgt. Napier, Southern, Mozingo, Isbell and Crawford. Mr. Drinnon was allegedly observed driving in a "suspicious manner" along Back Valley Road in Speedwell. The Defendant officers took pursuit in one or more patrol vehicles. The vehicle was apprehended, and Drinnon was arrested and taken into custody, where he was charged with reckless endangerment, reckless driving, evading arrest, felony possession of a controlled substance and drug paraphernalia, driving on a suspended license and violations of the seat belt laws.

18. According to news reports, a small amount of methamphetamine was recovered from the vehicle that was carrying Mr. Drinnon and another individual. On information and belief, when Drinnon exited the stopped vehicle, he admitted to using methamphetamine and he clearly exhibited signs of being under the influence of the drug, such as disorientation, confusion, and

paranoia. Though confused, Mr. Drinnon was compliant with the officers' commands and allowed himself to be restrained; alternatively, Drinnon only passively resisted arrest or their commands.

19. On information and belief, despite knowing the risk factors associated with using a ECW / TASER device on a methamphetamine user, Mr. Drinnon was shocked multiple times, including after he had been restrained. Defendant Crawford, a medic, was on the scene; Crawford knew or should have known the risk factors associated with using an ECW on a person known or suspected to be under the influence of meth. On information and belief, during his arrest, Drinnon was subjected to an ECW for longer than 15 seconds.

20. Defendants Napier, Southern, Mozingo, Isbell and Crawford knew Drinnon was in need of medical attention, both for his methamphetamine use and the application of a TASER device. Notwithstanding that they knew Drinnon needed such treatment from a medical facility equipped to provide the necessary care, none of the officers at the scene took action to ensure he was transferred to a medical facility for evaluation and care. He was instead taken directly to Claiborne County Jail.

21. The actions and inactions of Sgt. Napier, as a supervisor on the scene, evince inadequate supervision of the arrest and transport of Mr. Drinnon; especially as Sgt. Napier failed to intervene and require the arresting or transporting officers to take Drinnon for a medical evaluation prior to being booked at the County Jail.

22. **<u>Booking and Denial of Medical Care</u>**. At the Jail, Drinnon was still disoriented and became abnormally drowsy, a common sign or symptom of the "crash" or "comedown" from meth use. On information and belief, Drinnon was either not referred for screening by a medical professional at the Jail, or he was given only a cursory screening by a Jail nurse employed by SHP but not referred for medical evaluation by the SHP physician assigned to the Jail, or to an outside

-6-

Case 2:20-cv-00029-TRM-CRW   Document 1   Filed 02/18/20   Page 6 of 18   PageID #: 6

medical facility to check for acute methamphetamine toxicity and/or cardiac issues stemming from his being subjected to an ECW. Instead, at approximately 3:00 P.M., Drinnon was placed into a cell to "sleep it off."

23. On information and belief, for the next eight (8) hours, Mr. Drinnon was left in his cell, unmonitored, or only infrequently monitored, despite his risk factors for acute medical distress (recent methamphetamine use and repeated tasing). At approximately 9:00 P.M., Drinnon was discovered to have collapsed from a chair onto to the floor, and he presented with "sonorous respirations" or agonal breathing—gasping, labored breathing suggestive of a possible block in the airway or lack of oxygen to the brain.

24. Drinnon was intubated by Jail medical staff and sent to a local hospital where a CT scan revealed that he had suffered a middle cerebral artery (MCA) stroke. He was transferred to UT Medical Hospital as a code stroke blue. Upon admission at UT Medical, his pupils were fixed and nonreactive. Drinnon passed away on February 17, 2019 at 38 years old.

25. An autopsy was conducted. The autopsy confirmed that Drinnon died of an MCA stroke and further concluded the stroke was brought on by "acute methamphetamine toxicity."

26. On information and belief, Drinnon's stroke was directly caused by the arresting officers' unnecessary and wanton use of a TASER device. Scientific studies suggest that use of TASER devices can provoke cardiac arrest and cerebrovascular events, such as a stroke. *See*, *e.g.*, Zipes, "Sudden Cardiac Arrest and Death Associated with Application of Shocks from a TASER Electronic Control Device," Am. Heart Assoc., 125:2417–2422 (May 2012); Bell, Moon, and Dross, "Cerebrovascular accident (CVA) in association with TASER-induced electrical injury,"

Emerg. Radiol., 21(2):211-3 (Apr 2014). Persons under the influence of stimulant drugs, such as methamphetamine, are of particular risk of a sudden death following application of a TASER.[2]

27. Further, Drinnon admitted to methamphetamine use and showed signs of acute toxicity, yet he was not appropriately screened for and provided medical care. Patients suffering from acute meth toxicity should be closely monitored and potentially given medications to regulate their heart rate and/or lower their blood pressure to lessen the risk of cardiac arrest or a stroke. Instead, Drinnon was left alone in his cell to "sleep it off." This callous disregard for Drinnon's serious medical needs directly resulted in his death.

28. **Southern Health Partners**. Claiborne County contracted with Southern Health Partners to serve as the medical provider at the Jail. SHP is a Chattanooga-based, for-profit jail healthcare company. On information and belief, SHP's policy, custom, and practice is to staff jails primarily with lower-level credentialed professionals such as Licensed Practical Nurses (LPNs) unfamiliar with SHP's written policies and procedures, and supervised by an absentee or remote-based Medical Director who is often employed as the medical director of numerous other jails, in addition to having a private practice. To cut costs, SHP staffs its jails with the least possible number of medical providers. Furthermore, SHP prioritizes cost-cutting measures favored by municipalities it contracts with, at the expense of quality of care. On information and belief, it is the policy of both SHP and the County to delay referral to outside medical facilities in the hopes that detainees will make bond or serve their sentences before the situation becomes dire. These practices have caused numerous deaths and near-deaths in jails in the jurisdictions where SHP operates. Numerous lawsuits alleging a denial of medical care have been filed. For example:

---

[2] https://www.reuters.com/article/us-usa-taser-vulnerable-specialreport/special-report-why-higher-risk-human-targets-get-shocked-with-tasers-idUSKBN1FR1PZ

- *Finn v. SHP, et al.*, No. 1:10-cv-016 (W.D. Ky.) (jail physician employed by SHP was not made aware of inmate struggling through alcohol withdrawal in the Warren County Jail until after the inmate had died).

- *Shadrick v. SHP, et al.*, No. 4:11-cv-022 (W.D. Ky.) (inmate died of sepsis in the Hopkins County Jail after days of immobility, urinating and defecating on himself, without the doctor employed by SHP even knowing he was in Jail).

- *Hamilton v. SHP, et al.*, No. 7:11-cv-099 (E.D. Ky) (SHP physician diagnosed inmate with suspected "malingering" – the inmate was hospitalized and almost died after serious deterioration in his condition).

- *Hughes v. SHP, et al.*, No. 2:14-CV-140 (E.D. Tenn.) (alleging that SHP physician reviewed X-rays showing metal fragments in his right leg and knee, but informed plaintiff that the County "would never approve any surgery or costly medical help").

- *Duffer v. SHP, et al.*, No. 3:15-cv-860 (M.D. Tenn.) (alleging plaintiff's medical requests were continually rebuffed by SHP nursing staff, and he was finally seen by SHP physician over a month after he first began reporting that he was vomiting and spitting blood; the patient was later diagnosed with acute myeloid leukemia).

29. On information and belief, SHP has a policy or practice of prioritizing cost-cutting measures at the expense of providing adequate and timely medical care to inmates. For example, SHP's website marketing materials focus on providing "*affordable* inmate healthcare" over **breadth** and **quality** of care. Because Claiborne County prioritizes its own budgetary concerns over the need to provide adequate medical care to inmates at the Jail, the County contracted with SHP because it was "cheap" and willing to operate the Jail with the bare minimum of care and

-9-

Case 2:20-cv-00029-TRM-CRW   Document 1   Filed 02/18/20   Page 9 of 18   PageID #: 9

insufficient staffing. SHP utilizes LPNs to evaluate and treat inmates without sufficient training or supervision from a physician.

30. As explained above, nursing staff at Claiborne County Jail failed to refer Jeffrey Drinnon for outside medical evaluation and treatment, despite knowing that he had admitted to meth use and/or had been subjected to a TASER for a prolonged period. The actions by SHP and its medical staff deviated from generally accepted standards and established policies and procedures.

31. **Deliberate Indifference of Claiborne County**. The County knew or should have known due to prior complaints and lawsuits, that Southern Health Partners has policy or practice of providing constitutionally inadequate and/or delayed medical care. As noted above, numerous lawsuits alleging a denial of medical care have been filed. Despite this, the County retained SHP for these services, in deliberate indifference to the foreseeable risk of delays and inadequate care to inmates.

32. The County also knew or should have known that its deputies frequently utilized TASER devices as a means to inflict pain/punishment or encourage compliance in only minimally resistant arrestees. On information and belief, the County also failed to train its deputies that TASER devices should only be employed on individuals suspected to be under the influence of drugs when the person is violent or dangerous, due to the increased risk of cardiac arrest or stroke causing sudden death.

33. The County also had a policy and/or custom of allowing inmates who clearly presented as under the influence of drugs or going through withdrawal symptoms to simply "sleep it off" in a cell, rather than treat their condition as a medical emergency requiring a referral for immediate evaluation by a qualified medical professional or at a medical facility.

34. **Damages.** By reason of the above-described actions and omissions of these Defendants, Jeffrey Drinnon sustained physical and emotional injuries, including but not limited to great pain and suffering, and ultimately his death; all to his damage and harm in an amount to be ascertained. The aforementioned acts of the Defendants were willful, wanton, and malicious, and done with reckless indifference to and/or in callous disregard for the rights of Mr. Drinnon and justify an award of exemplary and punitive damages.

35. By reason of the above-described acts and omissions, Plaintiffs were required to retain an attorney to institute, prosecute, and render legal assistance in the instant action so that the Plaintiffs may vindicate the loss and impairment of Jeffrey Drinnon's rights. By reason thereof, Plaintiffs are entitled to reasonable attorney fees and costs pursuant to 42 U.S.C. Section 1988, the Equal Access to Justice Act, or any other provision set by law.

**CLAIMS UNDER THE U.S. CONSTITUTION
AND 42 U.S.C. § 1983**

**COUNT I
EXCESSIVE FORCE AND FAILURE TO PROTECT**
*AGAINST THE DEFENDANT OFFICERS*

36. Plaintiffs hereby incorporate and reallege paragraphs 1 through 35 as if set forth herein.

37. Jeffrey Drinnon had a right under the Fourth and/or Fourteenth Amendments to the U.S. Constitution not to be assaulted and have excessive forced used against him. This right was firmly established and well-known by Defendants prior to Mr. Drinnon's arrest.

38. During and after Jeffrey Drinnon's arrest, Defendants Napier, Southern, Mozingo, Isbell and Crawford used excessive force against Drinnon's person and which led to his death. Specifically, Defendants used (or acquiesced/ordered the use) of an ECW on Drinnon for a

prolonged period (greater than 15 seconds), while knowing or suspecting that Drinnon was under the influence of methamphetamine.

39. At different times during the arrest of Mr. Drinnon, some of the Defendant Officers had the opportunity to stop and prevent Drinnon from being subjected to an ECW but failed to do so. Sgt. Napier, as the senior ranking officer present at the scene, is trained in and knowledgeable as to the accepted and lawful uses of an ECW yet he failed to act.

40. There was no legal or justifiable cause for these Defendants to use the degree of force that was employed against Mr. Drinnon. On information and belief, Drinnon was either compliant or only passively resistant.

41. Due to Defendants' actions and omissions described above, Jeffrey Drinnon suffered and died. Plaintiffs suffered their own damages in the form of the loss of the love and support of their family member.

**WHEREFORE,** Plaintiff demands Judgment against the Defendant Officers in the amount of one million dollars and no cents (1,000,000.00), costs of this action, pre-judgment and post-judgment interest, and reasonable attorneys' fees under 42 U.S.C. § 1988.

### COUNT II
### EXCESSIVE FORCE – CUSTOM / FAILURE TO TRAIN
*AGAINST CLAIBORNE COUNTY (MONELL LIABILITY)*

42. Plaintiffs hereby incorporate and reallege paragraphs 1 through 35 as if set forth herein.

43. Jeffrey Drinnon had a right under the Fourth and/or Fourteenth Amendments to the U.S. Constitution not to be assaulted and have excessive forced used against him. This right was firmly established and well-known by the County prior to Mr. Drinnon's arrest.

44. On information and belief, Claiborne County had an unofficial policy tolerating the use of ECWs in situations in which they are not warranted, and further where application of an ECW increases the risk of sudden death. *See, e.g., Bunch v. Claiborne County, et al.,* 3:15-cv-454 (E.D. Tenn.) (alleging the decedent was attacked by a Jailer at the Claiborne County Jail who used a TASER on him).

45. As a matter of policy and practice, Claiborne County facilitates the type of misconduct that occurred against Jeffrey Drinnon by failing to adequately punish and discipline prior instances of inappropriate use of ECWs, thereby leading officers to believe that their actions will never be scrutinized and in that way, directly encouraging future abuses. Specifically, Claiborne County officers accused of inappropriate use of ECWs can be confident that they will not be investigated in earnest, and will not be disciplined, even where an officer in fact engaged in excessive force.

46. The County also failed to train its officers in the appropriate use of ECWs, both generally and when directed at at-risk populations such as persons under the influence of drugs.

47. The foreseeable result of these policies or customs was the excessive or inappropriate use of ECWs, causing injury and death to citizens such as Jeffry Drinnon.

48. Due to Defendants' actions and omissions described above, Jeffrey Drinnon suffered and died. Plaintiffs suffered their own damages in the form of the loss of the love and support of their family member.

**WHEREFORE,** Plaintiff demands Judgment against Claiborne County in the amount of one million dollars and no cents (1,000,000.00), costs of this action, pre-judgment and post-judgment interest, and reasonable attorneys' fees under 42 U.S.C. § 1988.

# COUNT III
# DENIAL OF MEDICAL CARE
*AGAINST THE DEFENDANT OFFICERS*
*and CLAIBORNE COUNTY (MONELL LIABILITY)*

49. Plaintiffs hereby incorporate and reallege paragraphs 1 through 35 as if set forth herein.

50. Jeffrey Drinnon had a right under the Fourteenth Amendment to the U.S. Constitution to timely and adequate medical care to treat his serious medical needs while he was in the custody of Claiborne County Jail and/or its deputies. This right was clearly established as of the date of Drinnon's arrest.

51. Defendants Napier, Southern, Mozingo, Isbell and Crawford, and the Unknown Jail Officers knew of Mr. Drinnon's need for immediate medical evaluation and care due to his admitted use of methamphetamine and the application of an ECW; on information and belief, they failed to refer him for such care. On information and belief, these actions and omissions are a direct result of Claiborne County's failure to train its officers to refer persons under the influence of drugs for immediate medical care to prevent unnecessary deaths or injuries from overdose.

52. Alternatively, Drinnon was referred by the Defendant Officers for medical evaluation by a Jail nurse employed by SHP, however, that nurse failed to refer him for evaluation by the SHP physician assigned to the Claiborn County Jail or for treatment at an outside medical facility. Claiborne County is complicit in this failure because the County knew or should have known based upon past complaints that SHP routinely provided delayed or constitutionally inadequate care. Despite this knowledge, the County retained SHP as its medical provider at the Jail.

53. The foreseeable result of these policies or customs was the delay or denial of medical care to persons suffering from the serious medical need of acute drug toxicity and/or prolonged exposure to ECWs, causing injury and death to citizens such as Drinnon.

54. Due to Defendants' actions and omissions described above, Jeffrey Drinnon suffered and died. Plaintiffs suffered their own damages in the form of the loss of the love and support of their family member.

**WHEREFORE,** Plaintiff demands Judgment against the Defendant Officers and Claiborne County in the amount of one million dollars (1,000,000.00), costs of this action, pre-judgment and post-judgment interest, and reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT IV
## DENIAL OF MEDICAL CARE
*AGAINST SOUTHERN HEALTH PARTNERS (MONELL LIABILITY)*

55. Plaintiffs hereby incorporate and reallege paragraphs 1 through 35 as if set forth herein.

56. Jeffrey Drinnon had a right under the Fourteenth Amendment to timely and adequate medical care to treat his serious medical needs while he was in the custody of Claiborne County Jail. This right was clearly established as of the date of his arrest.

57. As the contracted medical provider at the Claiborne County Jail, SHP acted under color of law and was obligated to protect Drinnon's constitutional rights and provide him with timely and adequate care.

58. On information and belief, upon his arrival at the County Jail, Drinnon was given only a cursory medical evaluation by a Jail nurse employed by SHP, and was not referred for further evaluation or treatment by the SHP physician assigned to the Jail, or at an outside medical facility. These actions and omissions amount to constitutionally inadequate care because Drinnon

had admitted to methamphetamine use and further had been subjected to application of an ECW, thus he had a serious medical need for evaluation to ensure he did not suffer injuries or death from acute methamphetamine toxicity or a meth-induced heart attack or stroke.

59. On information and belief, it was the unofficial policy and/or custom of SHP to provide delayed or inadequate care to cut costs and maximize profits. The foreseeable result of this policy was injuries to inmates at Claiborne County Jail. SHP implemented this policy in deliberate indifference to the constitutional rights of inmates like Drinnon.

60. Due to Defendants' actions and omissions described above, Jeffrey Drinnon suffered and died. Plaintiffs suffered their own damages in the form of the loss of the love and support of their family member.

**WHEREFORE,** Plaintiff demands Judgment against the Defendant Officers and Claiborne County in the amount of one million dollars (1,000,000.00), costs of this action, pre-judgment and post-judgment interest, and reasonable attorneys' fees under 42 U.S.C. § 1988.

## CLAIMS UNDER THE LAWS OF TENNESSEE

### COUNT IV
### ASSAULT AND BATTERY
*AGAINST THE DEFENDANT ARRESTING OFFICERS*

61. Plaintiffs hereby incorporate and reallege paragraphs 1 through 35 as if set forth herein.

62. On February 15, 2019, these Defendants assaulted Jeffrey Drinnon through prolonged use of an ECW when this degree of force was not warranted by the situation presented, i.e., Drinnon was not violent or a danger to himself or others and at most passively resisted arrest once his vehicle was apprehended.

63. The assault and battery upon Jeffrey Drinnon's person by Defendants resulted in and/or contributed to serious injury, to wit, a catastrophic stroke leading to his death.

**WHEREFORE,** Plaintiffs demand Judgment against these Defendants in the amount of seven hundred fifty thousand dollars ($750,000.00), costs of this action, pre-judgment and post-judgment interest.

## COUNT V
## NEGLIGENCE / GROSS NEGLIGENCE
*AGAINST THE DEFENDANT JAIL OFFICERS*

64. Plaintiffs hereby incorporate and reallege paragraphs 1 through 35 as if set forth herein.

65. As sworn deputies, the Defendant Officers owed a duty of care to Jeffrey Drinnon (and all citizens in their custody) to refer him for medical attention as needed.

66. These Defendants breached this duty of care by failing to refer Mr. Drinnon for medical evaluation and treatment, despite knowing that he was under the influence of methamphetamine and/or had been subjected to an ECW for a prolonged period.

67. A foreseeable result of this breach of duty was that Drinnon would suffer injury such as a heart attack or stroke from the combination of the meth in his system and the prolonged application of the ECW.

68. As a direct result of these actions or omissions, Jeffery Drinnon suffered and died.

**WHEREFORE,** Plaintiffs demand Judgment against these Defendants in the amount of seven hundred fifty thousand dollars ($750,000.00), costs of this action, pre-judgment and post-judgment interest.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury pursuant to their Constitutional right to a trial by jury and Federal Rule 38 (b), Federal Rules of Civil Procedure.

**RESPECTFULLY SUBMITTED**, this the **17th** day of **February**, 2019.

                                        **THE BOWLIN LAW FIRM P.C.**

By: _____ *for The Firm*
      Troy L. Bowlin, II No. 025893
      Attorney for Plaintiff
      First Tennessee Plaza
      800 South Gay Street, Suite 2131
      Knoxville, Tennessee 37929
      troy@tblf-pc.com
      www.thebowlinlawfirm.com